IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-01516-DME-BNB

TED WOOD,

      Plaintiff,

v.

HOUGHTON MIFFLIN HARCOURT PUBLISHING COMPANY, and
R.R. DONNELLEY & SONS COMPANY,

      Defendants.

---

## ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT

---

Pending before the Court are four motions for partial summary judgment.

On July 31, 2008, Plaintiff Ted Wood ("Wood") filed a motion for partial

summary judgment on Houghton Mifflin Harcourt ("HMH")'s and R.R. Donnelley &

Sons ("Donnelley")'s liability for copyright infringement.  (Dkt. #97.)  HMH and

Donnelley responded on August 20, 2008 (Dkt. #123), and Wood replied on September 4,

2008 (Dkt. #140).  Therefore, this motion is ripe for determination.

On August 8, 2008, Donnelley filed a motion for partial summary judgment on

Wood's <u>Summer Success</u> claims and his request for disgorgement of profits.  (Dkt. #107.)

Wood responded on August 25, 2008 (Dkt. #125), and Donnelley replied on September 9,

2008 (Dkt. #144).  Therefore, this motion is ripe for determination.

On August 8, 2008, HMH filed a motion for partial summary judgment on Wood's

request for the disgorgement of profits.  (Dkt. #108.)  Wood responded on September 2,

2008 (Dkt. #135), and HMH replied on September 17, 2008 (Dkt. #151). Therefore, this motion is ripe for determination.

On August 8, 2008, HMH filed a motion for partial summary judgment on Wood's fraud claims and request for exemplary damages. (Dkt. #110.) Wood responded on August 28, 2008 (Dkt. #138), and HMH replied on September 12, 2008 (Dkt. #148). Therefore, this motion is ripe for determination.

This Court GRANTS IN PART and DENIES IN PART Wood's motion for partial summary judgment on Defendants' liability for copyright infringement; GRANTS IN PART and DENIES IN PART Donnelley's motion for partial summary judgment on Wood's <u>Summer Success</u> claims and his request for disgorgement of profits; DENIES HMH's motion for partial summary judgment on Wood's request for disgorgement of profits; and DENIES HMH's motion for partial summary judgment on Wood's fraud claims and request for exemplary damages.

## I. Background

Ted Wood is a professional photographer who resides in Colorado. HMH is a publisher based in Boston, Massachusetts. Donnelley is a full-service printer headquartered in Chicago, Illinois. From 1999 to 2002, Wood sold to HMH six licenses permitting the publisher to reproduce nine of his photographs in two textbook series, both entitled <u>The Language of Literature</u> ("LOL"), and in an educational periodical entitled <u>Summer Success Reading Magazine</u> ("SSRM"). Donnelley printed the LOL textbooks.

Wood alleges that each of the licenses at issue in this case authorized HMH to publish no more than 40,000 copies of the textbook or magazine in which his copyrighted photographs were to appear, and to do so only in North America.  He further alleges that both Donnelley and HMH infringed his copyright by printing and publishing significantly in excess of 40,000 copies of the LOL textbooks, and that HMH infringed his copyright by publishing in excess of 40,000 copies of the SSRM periodicals.[1]  HMH committed an additional infringement of his copyright, according to Wood, when it re-published several of his photos in a recent edition of SSRM without securing a license to do so.  Wood is making claims of copyright infringement, fraud, and fraudulent concealment against HMH, and a claim of copyright infringement against Donnelley.  He seeks injunctive relief, actual damages, and disgorgement of profits against both HMH and Donnelley, as well as exemplary damages against HMH.

This Court has jurisdiction over Wood's copyright claim under 28 U.S.C. § 1331 and 28 U.S.C. § 1338.  This Court has supplemental jurisdiction, 28 U.S.C. § 1367, over Wood's fraud and fraudulent concealment claims, both of which are brought under Colorado law.  Wood's state and federal claims "derive from a common nucleus of operative fact."  United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966).

---

[1]While Wood alleges in his Second Amended Complaint that Donnelley printed the SSRM periodicals (Dkt. #84 at 6), he acknowledges in his motion for partial summary judgment that he no longer contends that Donnelley was the printer of the SSRMs (Dkt. #97 at 4.).

## II. Documentary record

Over a period of several years, from 1999 through 2002, Wood sold licenses to HMH (generally acting through its subsidiary McDougal Littell) to reproduce nine of his copyrighted photographs in HMH textbooks and educational periodicals. The documentary record includes a number of requests from HMH for permission to reproduce Wood's photos, as well as a number of invoices through which Wood granted this permission. These requests and invoices, which do not contain identical terms in every instance, involved the following textbooks and periodicals:

(1) Language of Literature, Grade 6, 2001 ("LOL 6, 2001")

(2) Language of Literature, Grade 6, 2002 ("LOL 6, 2002")

(3) Language of Literature, Grade 7, 2001 ("LOL 7, 2001")

(4) Language of Literature, Grade 7, 2002 ("LOL 7, 2002")

(5) Great Source Summer Success Reading Magazine, Grade 5, 2001 ("SSRM 5, 2001")

(6) Great Source Summer Success Reading Magazine, Grade 7, 2002 ("SSRM 7, 2002").[2]

Additionally, Wood alleges that there are two editions of SSRM in which HMH allegedly reprinted his photographs without securing a license:

(7) Great Source Summer Success Reading Magazine, Grade 5, 2008 ("SSRM 5, 2008")

(8) Great Source Summer Success Reading Magazine, Grade 7, 2008 ("SSRM 7, 2008").

---

[2]Wood's Motion for Partial Summary Judgment refers to a collective "2001/2002 edition" of SSRM 5 and 7. (Dkt. #97 at 2, 3.) However, because both the Second Amended Complaint and Proposed Final Pretrial Order distinguish between SSRM 5, 2001, and SSRM 7, 2002, this Order also adopts that distinction.

All four <u>Language of Literature</u> textbooks were printed by Donnelley; none of the four <u>Summer Success</u> magazines was printed by Donnelley.

Wood alleges that Donnelley and HMH infringed his copyright by significantly exceeding the scope of the licenses he issued for these texts and magazines. The documentary record contains the following information as to each license:

(1)  **LOL 6, 2001**

(a)  <u>Invoice from Wood to HMH subsidiary McDougal Littell</u>, dated April 23, 1999, licensing the use of four photos. No mention of limitations on number of copies or geographical distribution. (Dkt. #97, Ex. B to Ex. 1, at 23.) There is no request letter from HMH matching this invoice.

(b)  <u>Request letter from HMH subsidiary McDougal Littell to Wood</u>, dated November 12, 1999, for permission to add an additional use of one of the photos licensed in the April 23, 1999, invoice, <u>supra</u>. Specifies "[o]ne-time North American rights" and "press run of under 40,000 circulation." (<u>Id.</u> at 22.)

(c)  <u>Invoice from Wood to HMH subsidiary McDougal Littell</u>, dated November 15, 1999, licensing the additional use of the photo requested in HMH's November 12, 1999, letter, <u>supra</u>. No mention of limitations on number of copies or geographical distribution. (<u>Id.</u> at 24.)

(2)  **LOL 6, 2002**

(a)  <u>Request letter from HMH subsidiary McDougal Littell to Wood</u>, dated September 8, 2000, for permission to re-use the four Wood images published in

LOL 6, 2001. Specifies "North American rights, English only, for a print run of 40,000." (Id. at 25.)

(b) <u>Invoice from Wood to HMH subsidiary McDougal Littell</u>, dated September 27, 2000, licensing re-use of the four photos requested in HMH's September 8, 2008, letter, <u>supra</u>. No mention of limitations on number of copies or geographical distribution. (Id. at 26.)

(3) **<u>LOL 7, 2001</u>**

(a) <u>Invoice from Wood to HMH subsidiary McDougal Littell</u>, dated June 29, 1999, licensing the use of two photos. Specifies "[u]sage rights" as "[o]ne-time print run under 40,000, North American rights, English language only." (Id. at 28.) There is no request letter from HMH matching this invoice.

(4) **<u>LOL 7, 2002</u>**

(a) <u>Request letter from HMH subsidiary McDougal Littell to Wood</u>, dated September 22, 2000, for permission to re-use the two Wood images published in LOL 7, 2001. Specifies "North American rights, English only, . . . for a print run of 40,000." (Id. at 27.)

(b) <u>Invoice from Wood to HMH subsidiary McDougal Littell</u>, dated September 22, 2000, licensing re-use of the two photos requested in HMH's September 22, 2008, letter, <u>supra</u>. Specifies "[u]sage rights" as "[o]ne-time print run under 40,000, North American rights, English language only." (Id. at 29.)

(5)    **SSRM 5, 2001**

(a) <u>Request letter from HMH subsidiary Brown Publishing Network</u>, dated April 3, 2001, for permission to use two Wood photos.  Specifies "[o]ne-time US Engl[ish] language rights"; "[u]nder 40,000 print run."  (<u>Id.</u>, Ex. C to Ex. 1, at 31.)

(b) <u>Invoice from Wood to HMH subsidiary Brown Publishing Network</u>, dated April 11, 2001, licensing use of the photos requested in HMH's April 3, 2001, letter, <u>supra</u>.  Specifies "US English language rights for a press run of under 40,000."  (<u>Id.</u> at 32.)

(6)    **SSRM 7, 2002**

(a) <u>Request letter from HMH subsidiary Brown Publishing Network</u>, dated April 3, 2001, for permission to use a "spot detail" of one of the Wood photos requested for SSRM 5, 2001.  Specifies "[o]ne-time US Engl[ish] language rights"; "[u]nder 40,000 print run."  (<u>Id.</u> at 31.)

(b) <u>Invoice from Wood to HMH subsidiary Brown Publishing Network</u>, dated April 11, 2001, licensing spot use requested in HMH's April 3, 2001, letter, <u>supra</u>.  Specifies "US English language rights for a press run of under 40,000."  (<u>Id.</u> at 32.)

(c) <u>Invoice from Wood to HMH subsidiary Brown Publishing Network</u>, dated February 1, 2002, licensing the use of a photo.  Specifies "US English language rights for a press run of under 40,000"; handwritten correction (presumably by

HMH employee) crosses out "US" and replaces it with "North American, as per email 1/31/02." (Id. at 33.)

(7) **SSRM 5 & SSRM 7, 2008**

(a) Request letter from agent of HMH subsidiary Great Source Education Group, dated January 16, 2008, for permission to use one Wood photo in a Summer Success publication. Specifies "English and Spanish" rights for a term of ten years, an "initial clearance" of 400,000 copies, and a geographical territory of the United States, Canada, and schools serving the U.S. military and U.S. agencies. Contains an additional provision regarding the possibility that Great Source might exceed the terms of the license: "Since the actual distribution will depend on demand for the program as determined by the market, Great Source would like to establish fees for additional distribution beyond the initial clearance. If necessary, at such time as its distribution approaches the initial clearance level, Great Source will notify you and expect your invoice for the additional fee, upon payment of which the distribution will automatically be increased." (Dkt. #123, Ex. M.)

(b) There is no document evidencing that Wood issued a license in response to this offer.

## III. Summary judgment motions

A. **Summary judgment standard**

In deciding a summary judgment motion, this Court "consider[s] the factual record, together with all reasonable inferences derived therefrom, in the light most

favorable to the non-moving party[,] and . . . do[es] not weigh the evidence or make credibility determinations." Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research, 527 F.3d 1045, 1050 (10th Cir. 2008). "Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(c)). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

The movant bears the burden of demonstrating the absence of a material fact. Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1084 (10th Cir. 2006). In challenging such a showing, the non-movant "'must do more than simply show that there is some metaphysical doubt as to the material facts.'" Id. (quoting Palladium Music, Inc. v. EatSleepMusic, Inc., 398 F.3d 1193, 1196 (10th Cir. 2005) (quoting, in turn, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986))).

The summary judgment determination "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." Id. at 252. "Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden. . . . The question here is whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not." Liberty Lobby, 477 U.S. at 254.

B.  **Wood's motion for partial summary judgment on HMH's and Donnelley's liability for copyright infringement**

    1.    *Elements of copyright infringement under the Copyright Act of 1976*

The Copyright Act of 1976 provides that "the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords; . . . (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending . . . ." 17 U.S.C. § 106. "'Anyone who violates any of the exclusive rights of the copyright owner,' that is, anyone who trespasses into his exclusive domain by using or authorizing the use of the copyrighted work in one of the five ways set forth in the statute, 'is an infringer of the copyright.'" Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 433 (1984) (quoting 17 U.S.C. § 501(a)).

One who exceeds the scope of a license to reproduce a copyrighted work likewise is an infringer of the copyright. See Jacobsen v. Katzer, 535 F.3d 1373, 1379-80 (Fed. Cir. 2008) ("If . . . a license is limited in scope and the licensee acts outside the scope, the licensor can bring an action for copyright infringement."); S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1087-88 (9th Cir. 1989) ("A licensee infringes the owner's copyright if its use exceeds the scope of its license. The critical question is not the existence but the scope of the license." (citing Gilliam v. Am. Broadcasting Cos., 538 F.2d 14, 20 (2d Cir. 1976))); 3-10 Nimmer on Copyright § 10.15[A] ("[W]hen a license is limited in scope, exploitation of the copyrighted work outside the specified limits constitutes an infringement.").

To establish copyright infringement, Wood must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, Inc., v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); see Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc., 528 F.3d 1258, 1262 (10th Cir. 2008); 4-13 Nimmer on Copyright § 13.01 (2008). Here, because Wood issued licenses for six of the eight publications that he alleges violated his copyright, he must further establish that those licenses were limited in scope, and that HMH and/or Donnelley exceeded that scope. See Jacobsen, 535 F.3d at 1380; 3-10 Nimmer on Copyright § 10.15[A].

2.     *Claims against HMH*

    a.     Wood's claims and evidence

Wood has come forward with evidence demonstrating that he is the owner of the copyright of the nine images at issue in this lawsuit. (Dkt. #97, Ex. A to Ex. 1, at 7-20.) He alleges that the licenses he issued for LOL 6 and 7, 2001 and 2002, and those he issued for SSRM 5, 2001, and SSRM 7, 2002, were limited by their terms to reproduction of 40,000 copies of his photographs. He further alleges that he never issued a license for SSRM 5 and 7, 2008.

    i. **LOL 7, 2001 and 2002; SSRM 5, 2001, and SSRM 7, 2002**

Wood has produced probative evidence that the licenses he issued for LOL 7, 2001 and 2002, SSRM 5, 2001, and SSRM 7, 2002, were limited by their terms to reproduction of 40,000 copies of his photographs. This evidence consists of Wood's specifically

limiting language on the invoices he sent to HMH; his language is generally identical to that in HMH's request letters, where those letters are available. (Dkt. #97, Ex. B to Ex. 1, at 28, 29; Ex. C to Ex. 1, at 32, 33 (Wood's invoices); see also id., Ex. B to Ex. 1, at 27; Ex. C to Ex. 1, at 31 (HMH's request letters).) Therefore, for LOL 7, 2001 and 2002, SSRM 5, 2001, and SSRM 7, 2002, Wood has met his burden of establishing that he is the holder of the copyright and that he issued a license that was specifically limited in scope.

Wood has also produced probative evidence that HMH exceeded the scope of the licenses issued for LOL 7, 2001 and 2002, SSRM 5, 2001, and SSRM 7, 2002. In its responses to Wood's request for admissions, HMH admitted that it had published "200,000 or more copies" of both the 2001 and 2002 editions of LOL 7. (Id., Ex. 5, at 15 (response to request #38), 19 (response to request #50).) Wood further cites to HMH's inventory purchase records (id., Exs. 3, 4) as evidence that HMH published a total of 1,382,264 copies of LOL 7, 2001 and 2002; 204,395 copies of SSRM 5, 2001; and 103,795 copies of SSRM 7, 2002 (Dkt. #97 at 3). Therefore, for these four publications, Wood has met his burden of establishing that HMH exceeded the scope of its license and thus violated his copyright.

### ii. **LOL 6, 2001 and 2002**

Wood has not, however, produced such probative evidence for the licenses he issued for LOL 6, 2001 and 2002. The invoices Wood issued for those licenses contain no limiting language as to scope (see id., Ex. B to Ex. 1, at 23, 24, 26); however, Wood

alleges, based on the language in HMH's request letters, that these licenses, too, were limited in scope to reproduction of 40,000 copies (see id., Ex. B. to Ex. 1, at 22, 25). Therefore, while Wood has established that he is the holder of the copyright for the photographs reproduced in LOL 6, 2001 and 2002, he has not established that the license he issued for their reproduction was limited in scope. The Court finds that this issue is in dispute and cannot be resolved in this summary judgment proceeding.[3] Wood's motion for partial summary judgment on HMH's liability for copyright infringement as to LOL 6, 2001, and LOL 6, 2002, is DENIED.

### iii. **SSRM 5 and 7, 2008**

Wood has met his burden of establishing that he is the copyright owner of the photos at issue in these two periodicals. He alleges that he never issued a license for their reproduction. More important, as discussed infra, is that HMH never put on any evidence, nor even made any allegation, that it had received a license from Wood covering these two periodicals.

### b.   HMH's defenses and evidence

HMH argues that there are two genuine issues of material fact that should defeat Wood's motion for partial summary judgment on liability for copyright infringement: (1) a dispute over the documents and terms that comprise the licenses; and (2) a dispute over

---

[3]The Court's summary judgment analysis thus does not need to reach, for these two textbooks, the question of whether HMH undisputedly violated Wood's copyright.

the meaning of the term "40,000" in the licenses.[4]   The Court has already addressed the first argument.  Regarding the second argument, HMH argues that phrases such as "press run of under 40,000" did not, in fact, place any limit on the scope of the license, because trade usage dictates that the number 40,000 is simply an industry standard that means something along the lines of "a single edition of a large, 'basal,' educational textbook." (Dkt. #123 at 9-10, 14-18.)  HMH does not attempt to explain why or how this purported large-textbook standard should be applied to a license for a 16-page educational magazine (SSRM).

### i. Deposition of Ted Wood

As evidence for its argument that there is a genuine issue of material fact as to the meaning of the term "40,000," HMH points to Wood's deposition, in which Wood said that he believed the "standard print run" for which he licensed his photographs for textbook use was 40,000.  (Id., Ex. A-3, at 66:18-21; 81:8-14.)  However, this testimony does not support HMH's argument that the term "40,000" means more than 40,000 copies when that term is used in the license.  Therefore, Wood's deposition does not create a genuine issue of material fact as to the meaning of that term.

---

[4]HMH correctly points out that under Colorado law, "evidence of an industry standard is admissible to determine the parties' intent when entering into a contract, regardless of whether the contract appears facially ambiguous or unambiguous."  (Dkt. #123 at 14 (citing Employment Television Enters. v. Barocas, 100 P.3d 37, 42 (Colo. Ct. App. 2004).)

## ii. **Deposition of Donald Lankiewicz**

To provide probative evidence of trade usage as to the meaning of the term "40,000," HMH hangs its hat almost exclusively on the deposition testimony of Donald Lankiewicz, the company's Senior Vice-President of Product Development. Lankiewicz testified as HMH's Federal Rules of Civil Procedure ("F.R.C.P.") 30(b)(6) witness regarding the company's licensing practices and other topics.[5] Lankiewicz became HMH's Senior Vice-President of Product Development in January of 2008; prior to that, he had worked with Charles Merrill Publishing, Harcourt Brace Jovanovich, and Holt, Reinhart & Winston for 26 years before moving to HMH in 2006. (Id., Ex. A-15, at 6, 14-15.) HMH did not attempt to qualify Lankiewicz as an expert on industry practices. (Dkt. #174, Proposed Final Pretrial Order, Ex. 5.) Therefore, he did not testify as an expert on such practices, but instead testified, as a lay witness, to his own understanding of HMH's licensing conduct.

Lankiewicz testified that when textbook publishers negotiated for licenses to reproduce copyrighted material, "[t]here was a general industry practice . . . to establish a certain number that they used and it became a sort of boilerplate number." (Dkt. #123, Ex. A-15, at 67:4-7.) When asked whether he meant to testify that "the term 40,000 and limited to 40,000–print run limited to 40,000– . . . did not limit the print run to 40,000," Lankiewicz answered, "Correct." (Id. at 69:13-18.) Instead, according to Lankiewicz, the number 40,000 "was just an industry convention probably in relation to other types of

---

[5]A Rule 30(b)(6) witness is designated by a corporation to appear on behalf of the corporation in response to a notice of deposition.

use of the images that could have been in a trade book or could have been in some other–some other publication but 40,000 seemed to represent the–the extent for textbooks? It was the number for textbooks." (Id. at 69:21-70:2.) Lankiewicz also acknowledged, however, that he had seen copyright licensing numbers of 30,000 and other numbers that "had yet gotten larger" than 40,000. (Id. at 68:22-69:3; 70:14-23.)

The gist of Lankiewicz's deposition testimony, in short, is that under his understanding of industry standards, a copyright license that specifies a print run of 40,000 copies simply does not limit publishers, which could reproduce over a million copies of the copyrighted work without seeking further permission from, or paying additional fees to, the copyright holder. (Id. 73:2-74:10.) Lankiewicz maintained this interpretation of the term "40,000" even when confronted with a textbook license that not only specified a limitation of 40,000 copies, but also dictated that "[t]hese rights are limited to the specific media and number of copies detailed above. This means that if additional copies or new editions are to be printed/published . . . , then [the copyright holder's] prior written authorization must be obtained."[6] (Id. 87:1-89:9.) Despite that language, according to Lankiewicz, trade usage dictated that the licensee could freely, and without additional permission from the licensor, reproduce "[m]ore copies than 40,000." (Id. 89:3.)

This Court does not make credibility determinations in evaluating motions for summary judgment. Champagne Metals, 458 F.3d 1073, 1084. Instead, the Court must

_____

[6]The license referred to in this part of Lankiewicz's deposition was not a license issued by Wood.

determine whether a reasonable jury could find that there was a dispute as to the meaning of the term "40,000" in the licensing contract.  See id.  Because HMH elected not to put on expert testimony as to the issue of trade usage, relying instead on the self-serving deposition testimony of its Rule 30(b)(6) witness, and because the phrase "under 40,000" seems to the Court to be a clear term not subject to a contrary (perhaps even nonsense) imputation that pursuant to trade usage it means "an unlimited amount greater than 40,000," this Court concludes that a reasonable jury could not find that the plain language of the licensing contracts was put into dispute by Lankiewicz's understanding of industry practice.  HMH must marshal "significant probative evidence tending to support" its position; "merely colorable" evidence will not suffice to defeat summary judgment.  Liberty Lobby, 477 U.S. at 249-250.  Lankiewicz's testimony simply does not, without more, rise to the level of the "significant[ly] probative."  See Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 714 (11th Cir. 1984) ("Self-serving statements by a plaintiff's corporate officers are not, alone, substantial enough evidence of antitrust injury for a plaintiff to survive a motion for summary judgment.").

First, Lankiewicz was not qualified to testify as an expert on industry practice (see Dkt. #174, Proposed Final Pretrial Order, Ex. 5.), and thus could testify only as to his own, patently self-serving, understanding of HMH's licensing conduct.  Second, because Wood has testified that he understood the term "40,000" to mean "40,000," there was no meeting of the minds as to Lankiewicz's proposed alternative interpretation of the term "40,000" that could overcome the plain language of the licensing agreements.  Third,

while this Court does not evaluate Lankiewicz's credibility in making such statements, HMH may not defeat summary judgment with such facially implausible and self-serving claims. In short, without substantially more evidence than that of Lankiewicz's testimony, this Court finds that no reasonable jury could, or would, find that a license limited by clear language to a run of "under 40,000" included permission to reproduce more than 40,000 copies–indeed, to reproduce any number of copies that the publisher or printer desired.

Furthermore, Lankiewicz's deposition clearly does not create a genuine issue of material fact as to the SSRM publications, as Lankiewicz testified that the industry standard regarding the term "40,000" applied specifically to textbooks (in this case, the LOL series). Indeed, in its January 16, 2008, letter to Wood requesting permission to use one of his photos in the SSRM periodicals, HMH subsidiary Great Source Education explained, "Since the actual distribution will depend on demand for the program as determined by the market, Great Source would like to establish fees for additional distribution beyond the initial clearance. If necessary, at such time as its distribution approaches the initial clearance level, Great Source will notify you and expect your invoice for the additional fee, upon payment of which the distribution will automatically be increased." (Dkt. #123, Ex. M.)

Therefore, Wood's motion for partial summary judgment against HMH as to LOL 7, 2001 and 2002, and as to SSRM 5, 2001, and SSRM 7, 2002, is GRANTED.

### iii. **SSRM 5 and 7, 2008**

Aside from its subsidiary Great Source Education's January 16, 2008, letter to Wood requesting permission to use one of his photos in SSRM 2008,[7] HMH has come forward with no evidence to contravene Wood's allegation that SSRM 5 and 7, 2008, contained reproductions of his copyrighted photos in the absence of any permission or license from Wood. Neither Wood nor HMH, that is, has produced a copy of–or even alleged the existence of–an invoice licensing that reproduction.

Therefore, Wood's motion for partial summary judgment against HMH as to SSRM 5 and 7, 2008 is GRANTED.

3.    *Claims against Donnelley*

a.    Wood's claims and evidence

Wood has come forward with evidence demonstrating that he is the owner of the copyright of the nine images at issue in this lawsuit. (Dkt. # 97, Ex. A to Ex. 1, at 7-20.) He alleges that the licenses he issued for LOL 6 and 7, 2001 and 2002, were limited by their terms to reproduction of 40,000 copies of his photographs. He acknowledges that Donnelley did not print the SSRM periodicals and does not seek summary judgment against Donnelley for those publications.

_____

[7]Oddly, this letter, dated January 16, 2008, requests permission to use Wood's copyrighted photo in SSRM "for first publication in the year 2007." (Dkt. #123, Ex. M.) After an exchange of emails with Great Source's licensing agent, the Bill Smith Group, Wood learned that the magazine had been printed in 2007 without his permission, which he found "a little upsetting." (See Dkt. #110, Ex. A (111-2 through 111-7).) Wood subsequently refused to issue a license for Great Source to re-use the SSRM photos.

b.  Donnelley's defenses and evidence

Donnelley has set forth the same defenses and evidence as has HMH.

c.  Printer liability for copyright infringement

As is evident from the elements of a claim for copyright infringement, see supra § III.B.1, "the Copyright Act does not require that the infringer know that he is infringing or that his conduct amount to a willful violation of the copyright owner's rights," Costar Group, Inc., v. Loopnet, Inc., 373 F.3d 544, 549 (4th Cir. 2004).  The Copyright Act does, however, require "conduct by a person who causes in some meaningful way an infringement."  Id.  An infringer engages in such conduct by "trespass[ing] into [the copyright holder's] exclusive domain by using or authorizing the use of the copyrighted work in one of the five ways set forth in the statute."  Sony Corp., 464 U.S. at 433.  The first of those five ways to infringe is "to reproduce the copyrighted work in copies."  17 U.S.C. § 106(1).

Here, Donnelley printed the LOL textbooks in numbers that exceeded the scope of the licenses granted to HMH.  While Donnelley is not jointly and severally liable with HMH for its infringing publication of the LOL series, it is liable for the act of printing itself.  See 3-12 Nimmer on Copyright, § 12.04[A][3](b) (2008) ("The copyright liability of a printer is limited to the particular acts of printing, so that a printer qua printer is not a related defendant with respect to subsequent infringing uses of the printed work.");  Respect Inc. v. Fremgen, 897 F. Supp. 361, 363 (N.D. Ill. 1995) ("[T]he nexus between the owner of the copyright and the printer of infringing copies arises when the

infringements are produced. The moment the printer printed he became liable to plaintiff. It was then that he invaded plaintiff's rights." (quotation, alteration omitted)).

Therefore, for the reasons explained in the sections, <u>supra</u>, regarding partial summary judgment against HMH, Wood's motion for partial summary judgment against Donnelley as to (1) LOL 7, 200l, and (2) LOL 7, 2002, is GRANTED. Wood's motion for partial summary judgment against Donnelley as to (1) LOL 6, 2001, and (2) LOL 6, 2002 is DENIED.

   4.  *Summary of rulings on this motion*

Wood's motion for partial summary judgment against HMH is GRANTED for the following publications: (1) LOL 7, 2001; (2) LOL 7, 2002; (3) SSRM 5, 2001; (4) SSRM 7, 2002; (5) SSRM 5, 2008; (6) SSRM 7, 2008.

Wood's motion for partial summary judgment against HMH is DENIED for the following publications: (1) LOL 6, 2001; (2) LOL 6, 2002.

Wood's motion for partial summary judgment against Donnelley is GRANTED for (1) LOL 7, 2001, and (2) LOL 7, 2002.

Wood's motion for partial summary judgment against Donnelley is DENIED for (1) LOL 6, 2001, and (2) LOL 6, 2002.

C.  **<u>HMH's motion for partial summary judgment on Wood's request for the disgorgement of profits</u>**

   1.  *Recovery of the infringer's profits under the Copyright Act*

"The Copyright Act provides the owner of a copyright with a potent arsenal of remedies against an infringer of his work, including an injunction to restrain the infringer

from violating his rights, the impoundment and destruction of all reproductions of his work made in violation of his rights, a recovery of his actual damages and any additional profits realized by the infringer or a recovery of statutory damages and attorneys' fees."

Sony Corp., 464 U.S. at 433-34.  The Copyright Act provides,

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.  In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b) (emphasis added).  The legislative history emphasizes the burden-shifting nature of this subsection:

> [O]nly those profits "attributable to the infringement" are recoverable; where some of the defendant's profits result from the infringement and other profits are caused by different factors, it will be necessary for the court to make an apportionment.  However, the burden of proof is on the defendant in these cases; in establishing profits the plaintiff need prove only "the infringer's gross revenue," and the defendant must prove not only "his or her deductible expenses" but also "the element of profit attributable to factors other than the copyrighted work."

H.R. Rep. 94-1476, 1976 U.S.C.C.A.N. 5659, 5777 (Sept. 3, 1976) (emphasis added).

Section 504(b)'s language and legislative history thus create a presumption that, once infringement has been proven, all of the infringer's gross revenue is initially deemed to be attributable to that infringement, and thus recoverable by the copyright holder.  See 4-14 Nimmer on Copyright § 14.03[B] (2008) ("'[A]ll gross revenue is presumed to be profit "attributable to the infringement," unless the infringer is able to demonstrate

otherwise.'" (quoting <u>Nelson-Salabes, Inc. v. Morningside Dev., LLC</u>, 284 F.3d 505, 512 n.9 (4th Cir. 2002))); <u>Bonner v. Dawson</u>, 404 F.3d 290, 294 (4th Cir. 2005) ("[O]nce liability has been shown, § 504(b) creates an initial presumption that the infringer's profits attributable to the infringement are equal to its gross revenue." (quotation, alteration omitted)).  The rationale for this burden-shifting lies in the notion that "'[v]ery often, the act of infringement allows the infringer to pocket as net profit a much larger percentage of his gross revenue than he could have absent the infringement.'"  4-14 Nimmer on Copyright § 14.03[B] (quoting <u>Johnson v. Jones</u>, 149 F.3d 494, 506 (6th Cir. 1998)).  "[P]rofits are awarded to prevent the infringer from unfairly benefit[t]ing from a wrongful act."  H.R. Rep. 94-1476, 1976 U.S.C.C.A.N. at 5777.

Not surprisingly, much of the action in courts' application of § 504(b) lies in "sophisticated analysis of causation."  <u>See</u> 4-14 Nimmer on Copyright § 14.03.  However, a copyright holder cannot meet its initial burden simply by pointing to "the infringer's total gross revenue from all of its profit streams."  <u>Bonner</u>, 404 F.3d at 294.  "Rather, 'gross revenue' refers only to revenue reasonably related to the infringement.  The copyright owner thus has the burden of demonstrating some causal link between the infringement and the particular profit stream before the burden-shifting provisions of § 504(b) apply."  <u>Id.</u> (citation omitted).  The Second Circuit articulated this principle in <u>Davis v. The Gap, Inc.</u>, 246 F.3d 152 (2d Cir. 2001):

> [W]e think the term "gross revenue" under the statute means gross revenue reasonably related to the infringement, not unrelated revenues.

Thus, if a publisher published an anthology of poetry which contained a poem covered by the plaintiff's copyright, we do not think the plaintiff's statutory burden would be discharged by submitting the publisher's gross revenue resulting from its publication of hundreds of titles, including trade books, textbooks, cookbooks, etc. In our view, the owner's burden would require evidence of the revenues from the sale of the anthology containing the infringing poem. The publisher would then bear the burden of proving its costs attributable to the anthology and the extent to which its profits from the sale of the anthology were attributable to factors other than the infringing poem, including particularly the other poems contained in the volume. . . . [T]he statutory term "infringer's gross revenue" should not be construed so broadly as to include revenue from lines of business that were unrelated to the act of infringement.

246 F.3d at 160; see also Polar Bear Prods., Inc., v. Timex Corp., 384 F.3d 700, 712 (9th Cir. 2004) ("The standard is straightforward: a copyright plaintiff is bound to no more and no less than its statutory obligation to demonstrate a causal nexus between the infringement and the profits sought."); Andreas v. Volkswagen of Am., Inc., 336 F.3d 789, 796 (8th Cir. 2003) ("The nexus requirement exists in both direct and indirect profits cases."); Univ. of Colo. Found. v. Am. Cyanamid, 196 F.3d 1366, 1375 (Fed. Cir. 1999).

However, establishing a causal nexus does not require the plaintiff "to put a . . . buyer on the stand to testify that she bought" the product at issue specifically because of the infringement. Andreas, 336 F.3d at 797. Where the plaintiff demonstrates that "the profits at issue are not generated by outside sources, but by money collected from the use of the specific infringed work," the plaintiff has established the required causal nexus. Bonner, 404 F.3d at 293. Furthermore, the Supreme Court has held that "an infringer who commingles infringing and noninfringing elements 'must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that

justly belongs to him.'" Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 567 (1985) (quoting Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 406 (1940)).

To decide this summary judgment motion, therefore, this Court needs to answer two questions: (1) Is there a genuine issue of material fact as to whether Wood has established a causal nexus between the infringement and the revenue stream(s) he has identified as HMH's "gross revenue"?[8] (2) Is there a genuine issue of material fact as to what portion of HMH's revenues from the LOL and SSRM series are attributable to factors other than the infringing reproduction of Wood's photos? The causal nexus asserted by Wood is simply that HMH infringed his copyright by publishing textbooks and periodicals containing his photographs, and that it profited from the sale of those textbooks and periodicals.

2. *HMH's motion and evidence*

HMH argues that it should be awarded summary judgment on Wood's request for the disgorgement of profits because no reasonable jury could conclude that any portion of its profits from the LOL series or the SSRM periodicals derived from its infringing use of Wood's photographs. (Dkt. #108 at 7.) HMH believes that because Wood's photos occupied roughly three of the thousand pages in LOL 6, 2001 and 2002; roughly one-half of one of the thousand and fifty pages in LOL 7, 2001 and 2002; slightly over one of the

_____

[8]Because Wood has demonstrated that "the profits at issue are not generated by outside sources, but by money collected from the use of the specific infringed work," he has established the causal nexus that is necessary to shift the burden of proof to HMH under § 504(b). Bonner, 404 F.3d at 293.

sixteen pages of SSRM 5, 2001 (with that one page being the cover); and roughly one-quarter of one of the sixteen pages of SSRM 7, 2002 (with that one-quarter page being the inside title page) (id. at 3-5), there is "no material issue of fact as to a causal nexus between the individual images at issue and the profits earned from the sale of the [textbook and periodical] programs" (id. at 7). HMH does not challenge Wood's identification of specific revenue lines derived from its publication of the LOL and SSRM series.[9]

<blockquote>a.      Low market value of licensing for "fungible" photographs</blockquote>

The heart of HMH's argument is that because it licensed photographs from Wood, rather than textual materials, his copyrighted material added no value–and thus no profits–to the language arts textbooks and periodicals at issue in this lawsuit. (See id. at 7-11.) In other words, HMH urges that because it is undisputed that the LOL and SSRM series focused on the language arts rather than the visual arts, there is no causal nexus between the photographs included in those series and the profits earned from their sale. (Id. at 7.) In support of this idea–the "immateriality of these images to the [language arts] programs"–HMH points to the low market value of images in language arts textbooks, "as reflected by the low licensing prices . . . a photographer could charge." (Id. at 9.) It further points to the fact that after Wood complained about his unlicensed images being used in SSRM 2008, "those images were quickly replaced, and the [language arts] programs remained on the market." (Id.) According to HMH, its experience with

---

[9]The record shows that Wood has garnered information on these revenue lines through discovery. (See, e.g., Dkt. #133, Exs. 2, 3.)

replacing Wood's photos in SSRM 2008 "demonstrates that the images are fungible elements that are not essential to what is actually being sold–a language arts curriculum." (Id.)

HMH's own argument in this context undermines the motion for summary judgment.  First, the very fact that the publisher pays fees for photographs to be used in language arts textbooks and periodicals illustrates that those photographs have value to HMH as it creates and markets textbooks.  Publishing companies are not in the business of subsidizing photographers; they are in the business of maximizing their sales of books and periodicals in order to maximize profits for their shareholders.  If images were truly "immaterial" in language arts publications, HMH surely would not be paying to include those images in its publications–and it just as surely would not have replaced Wood's images with others in SSRM 2008, after Wood objected to HMH's infringement of his copyright.  Whether such images are "fungible" is irrelevant here: HMH clearly believes, in designing and publishing its textbooks and periodicals, that paying licensing fees for photographs makes good business sense in the market for language arts programs.  Indeed, it can be inferred that language arts publications with good graphics sell better, and generate more profits, than language arts publications with no graphics.

> b.      Expert testimony of Drs. Lindley and Hooper

HMH also offers the opinion testimony of two qualified experts, Dr. Lindley and Dr. Hooper, both of whom have experience in the adoption of textbooks for entire states and for individual school districts within states.  Dr. Lindley offered his opinion that in

states where textbooks are adopted on a statewide plan, what is of critical importance is that the books are aligned with state academic standards; according to Lindley, "[s]uch books are not selected on the basis of the illustrations." (Id. at 11.) Dr. Hooper offered the observation that in states where textbooks are chosen within individual school districts, rather than statewide, he had "never known an instance where anyone made a decision to select a textbook based upon a particular photograph, illustration, or even a particular collection of photographs." (Id. at 12.) Neither Dr. Lindley nor Dr. Hooper offered expert testimony tending to establish that photographs in general do not add value to language arts textbooks, nor that Wood's photographs were not part of the photographic component of the publication.

While Dr. Lindley's and Dr. Hooper's testimony likely will be valuable to HMH in arguing to the jury that a large portion of HMH's profits from the sale of the LOL and SSRM series was attributable to factors other than the infringement of Wood's copyright, their testimony does not establish that there is no issue of material fact as to whether there is a causal nexus between HMH's profits and its infringing use of the photos. This testimony does not negate the inference that good photographs and artwork are a factor, generally, in the saleability of language arts materials, even if Drs. Lindley and Hooper are not aware of a situation where a sale depended upon a particular photograph. Wood's copyrighted photographs apparently contributed to the overall contribution that photographs and artwork make to the saleability of such material. It is HMH's burden to show what percentage of its profit is attributable to Wood's contribution, or HMH will be

liable to Wood for its profits from the entire publication.  In short, as "an infringer who commingle[d] infringing and noninfringing elements," HMH "must abide the consequences, unless [it] can make a separation of the profits so as to assure to the injured party all that justly belongs to him." Harper & Row, 471 U.S. at 567 (quotation omitted).

        c.     Speculative profits

HMH points to Nimmer on Copyright, 4-14 § 14.03[B][2], for the proposition that "When an infringer's profits are only remotely and speculatively attributable to the infringement, courts will deny recovery to the copyright owner."  Nimmer explains that "an award should be denied in two distinct types of cases: (1) those in which there existed no conceivable connection between the infringement and a given revenue stream; and (2) those in which it is unclear how much, if anything, the defendant earned from the infringement." Id. (quotation omitted).  Cases involving speculative profits, according to Nimmer, would be "those in which, despite the existence of a conceivable link, the plaintiff failed to offer anything more than mere speculation as to the existence of a causal connection between the infringement and the claimed revenues." Id. n.65 (quoting Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 520 (4th Cir.), cert. denied, 124 S. Ct. 2171 (2003)).

HMH suggests that because the Wood photographs were such a small portion of the LOL textbooks (which is true) and the SSRM periodicals (which is dubious), any profits attributable to the publication of the infringing photos could only be speculative.  Yet that argument does not fit with Nimmer's notion of speculative profits, which turns

not on the putative <u>size</u> of profits earned by the infringement, but rather on the absence of a clear "causal connection between the infringement and the claimed revenues." Wood has established that HMH published and profited from the publication of textbooks and periodicals containing his photographs; he has met his burden of establishing "causal connection." Wood also makes the cogent point that there is no logic to the proposition that because HMH may have earned only small profits from the use of his photographs, it therefore earned no profits that Wood may recover under § 504(b). (Dkt. #135 at 11.) "[W]hat is 'small' to HMH, who reaps billions in revenue per year, is likely much different to an individual copyright holder trying to earn[] a living by licensing his creative work. It is enough that the statute does not differentiate between great and small profits." (<u>Id.</u>)

3. *Ruling on this motion*

Based on the foregoing, Wood has established a causal nexus between HMH's profits from the publication of the LOL and SSRM series and its infringing use of his photographs in those series. Therefore, under § 504(b), the burden properly shifts to HMH to "prove [its] deductible expenses and the elements of profit attributable to factors other than the copyrighted work." HMH has not demonstrated that there is no issue of material fact as to what portion of its profits from publication of the LOL and SSRM series derived from factors other than its infringing use of Wood's original work.

HMH's motion for summary judgment on Wood's request for the disgorgement of profits is DENIED.

D.    **Donnelley's motion for partial summary judgment on Wood's SSRM claims and request for the disgorgement of profits**

Donnelley alleges, and Wood agrees, that there is no genuine issue of material fact as to whether Donnelley printed the <u>Summer Success</u> periodicals.  Therefore, Donnelley's motion for summary judgment on Wood's claims for copyright infringement in SSRM 5, 2001, SSRM 7, 2002, and SSRM 5 and 7, 2008, is GRANTED.

Donnelley also seeks summary judgment on Wood's request for the disgorgement of Donnelley's profits attributable to its printing of LOL 6 and LOL 7, 2001, and LOL 6 and LOL 7, 2002.

1.    *Recovery of the infringer's profits under the Copyright Act*

<u>See</u> <u>supra</u>, § III.C.1.

2.    *Donnelley's motion and evidence*

Donnelley incorporates into its motion for summary judgment the facts and arguments set forth in HMH's Motion for Partial Summary Judgment on Plaintiff's Request for the Disgorgement of Profits.

Donnelley's primary argument, in addition to the arguments made by HMH, lies in its assertion that under § 504(b), none of its profits from printing the LOL textbooks may be attributed to its infringement of Wood's copyright, because, "as . . . only a printer, [Donnelley doesn't] do licensing research."  (Dkt. #107 at 3.)  Terry Smith Kelley, Donnelley's designated corporate witness under F.R.C.P. 30(b)(6), testified in her deposition that Donnelley played no part in the composition of the textbooks, that "[i]t's kind of understood in the printing industry that [the printer is] responsible for the printing

part, [and] the publishers are responsible for the licensing," and that Donnelley's revenue from the LOL textbooks "derived entirely from the printing charges HMH paid." (Id. at 3, 4.)

As with the testimony of HMH's experts, Kelley's testimony is likely to be valuable to Donnelley in arguing to the jury that a large portion of its revenues derived from printing the LOL series was attributable to factors other than its infringement of Wood's copyright. However, the undisputed fact that Donnelley did not share in HMH's profits from the marketing and sale of the textbooks does not alter the similarly undisputed fact that Donnelley directly earned revenue by printing books that contained Wood's copyrighted photos. In other words, while Donnelley is not a "co-infringer" with HMH in HMH's infringement of Wood's copyright, and thus may not be held jointly and severally liable with HMH for that infringement, Donnelley did infringe Wood's copyright in its own right, and may be held liable for that infringement. See Respect Inc., 897 F. Supp. at 363. Because Wood has established a causal nexus between a specific Donnelley revenue stream and its printing of textbooks that infringed upon his copyright, the burden now shifts to Donnelley, under § 504(b), to "prove [its] deductible expenses and the elements of profit attributable to factors other than the copyrighted work." That is a matter of dispute that can not be decided on summary judgment.

3.    *Ruling on this motion*

For the foregoing reasons, and for the same reasons that the Court denied HMH's motion for summary judgment on this issue, Donnelley's motion for partial summary judgment on Wood's request for the disgorgement of profits is DENIED.

Donnelley's motion for partial summary judgment on Wood's SSRM claims is GRANTED.

E.    **HMH's motion for partial summary judgment on Wood's fraud claims and request for exemplary damages**

In this motion, HMH seeks summary judgment on Wood's state-law claims for fraud (Count II of the Second Amended Complaint), fraudulent concealment (Count III of the Second Amended Complaint), and exemplary damages.

Wood's claims for fraud and fraudulent concealment are based on his allegation that HMH knew, when it requested permission to print 40,000 copies of textbooks or magazines containing his photos, that it would in fact publish far more than 40,000 copies; and on his allegation that in setting licensing prices that he believed were reasonable for 40,000 copies, Wood relied to his detriment on that intentional misrepresentation.

1.    *HMH's arguments regarding Wood's fraud claim*

a.    Elements of fraud under Colorado law

To establish fraud under Colorado law, Wood must show the following:

(1) that HMH made a false representation of a material fact,
(2) knowing that representation to be false;
(3) that Wood was ignorant of the falsity;

(4) that the representation was made with the intention that it be acted upon;
(5) and that reliance on the representation resulted in damage to Wood.

Coors v. Sec. Life of Denver Ins. Co., 112 P.3d 59, 66 (Colo. 2005).  Mere failure to

perform a contractual obligation does not constitute fraud.  State Bank of Wiley v. States,

723 P.2d 159, 160 (Colo. Ct. App. 1986).  However, "[a] promise concerning a future act,

when coupled with a present intention not to fulfill the promise, can be a

misrepresentation which is actionable as fraud."  Kinsey v. Preeson, 746 P.2d 542, 550

(Colo. 1987) (quotation omitted).

    b.  Wood's reliance on statements from HMH

   HMH argues that Wood has come forth with no evidence to demonstrate that he

relied to his detriment on any alleged misrepresentations made by HMH in its letters

requesting permission to print 40,000 copies of his photos in the LOL and SSRM series.

    First, HMH argues that HMH's letters to Wood contain no "promises" to the

effect that publication and distribution would be limited to 40,000 copies in North

America.  (Dkt. #110 at 11.)  Because, as HMH itself points out in its Response to

Wood's motion for partial summary judgment for liability for copyright infringement (see

Dkt. #97 at 34), the terms of the licensing contracts for LOL 6, 2001 and 2002, are in

dispute, there remains a genuine issue of material fact as to whether HMH did, indeed,

make such a promise as to those textbooks.  However, as to the terms of the licensing

contracts for LOL 7, 2001 and 2002, SSRM 5, 2001, and SSRM 7, 2002, there is no such

dispute, as both HMH's request letters and Wood's invoices for those publications

specify North American rights for a print run of 40,000.  In other words, a reasonable jury

certainly could find that in making the licensing contracts for LOL 7, 2001 and 2002, SSRM 5, 2001, and SSRM 7, 2002, HMH did make promises as to numerical and geographical limitations on its reproduction of Wood's photos.

Second, HMH argues that Wood has not come forward with evidence demonstrating that there is a genuine issue of material fact as to whether he relied on such promises. HMH points out that Wood did not always copy into his invoices the limiting language that he says he relied on, an assertion that is true with respect to LOL 6, 2001 and 2002. (Dkt. #110 at 11-12.) However, the distinction between HMH's language in its request letter and Wood's language in his invoices for those textbooks means only that the terms of the licensing contracts are in dispute, not that Wood indisputably did not rely on HMH's language. Furthermore, for LOL 7, 2001 and 2002, SSRM 5, 2001, and SSRM 7, 2002, the limiting language of Wood's invoices <u>does</u> match the limiting language of HMH's request letters. HMH also points out that Wood did not retain HMH's original request letters that included the language upon which he now claims to have relied. (<u>Id.</u>) While that fact may indicate that Wood was sloppy in his recordkeeping, it does not establish the absence of a genuine issue of material fact as to his reliance on HMH's alleged promises. In addition, Wood testified in his deposition that the size of a print run was "one of several criteria he used in determining how much he would charge for a license." (Dkt. # 133 at 9, citing both Wood depositions.)

Finally, HMH emphasizes that Wood testified in his first deposition that "even when a textbook company made no mention of a print run term [in its request for

permission to use his photos], he would assume 40,000 in order to set the price for a textbook usage, without inquiring if this bore any relationship to the actual anticipated print run." (Dkt. #110 at 12.) Yet a reasonable jury could find that this fact simply demonstrates that Wood believed that a licensing contract granting permission to reproduce 40,000 copies of his work meant that a publisher would print no more than 40,000 copies of a textbook containing that work. In other words, if Wood were willing to license up to 40,000 copies for a certain price and then issued such a license in the belief that its terms would be adhered to, there would be no need for him to inquire "if this bore any relationship to the actual anticipated print run."

Therefore, a reasonable jury could find that Wood relied on a promise by HMH to print no more than 40,000 copies of LOL 7, 2001 and 2002, SSRM 5, 2001, and SSRM 7, 2002.

    c. <u>Wood's purported fraud claim as simply a contract claim</u>

HMH argues that when it requested permission to print 40,000 copies of Wood's photos, with North American licensing rights, there was no promise of future conduct being made. (Dkt. #110 at 13.) Instead, according to HMH, these numerical and geographical limitations were simply "contractual obligation[s]," and the mere failure to perform such obligations does not constitute fraud. <u>State Bank of Wiley</u>, 723 P.2d at 160.

A reasonable jury certainly could find that HMH's requests for permission to print 40,000 copies of Wood's photos, with North American licensing rights, constituted "[a] promise concerning a future act." <u>Kinsey</u>, 746 P.2d at 550. Furthermore, that jury could

also find that, where HMH knew when making the request that it would exceed both the numerical and geographical limitations stipulated in its letters, its promise was "coupled with a present intention not to fulfill the promise." Id. Therefore, there exists a genuine issue of material fact as to whether Wood may succeed in his fraud claim at trial.

d.    Wood's injury proximately caused by the alleged fraud

HMH argues that Wood "has no evidence that he has been damaged beyond the purported loss of a license fee for allegedly unlicensed copies," and that Wood's fraud claim is merely an attempt to run an end-around the Copyright Act, which does not permit exemplary damages. (Dkt. #110 at 15, 16.) The gist of HMH's argument in this context is that any injury Wood suffered derived from HMH's breach of its licensing agreement with Wood, and not from its alleged misrepresentation as to the scope of its planned publication. In other words, HMH argues that there is no dispute as to the material fact that in the absence of HMH's infringement of Wood's copyright, Wood would not have suffered any injury proximately caused by fraud.

The evidence Wood marshals in support of his contrary position lies in his own statements made in his depositions and affidavit. Those statements aver that Wood was injured by HMH's alleged misrepresentations in two ways that are distinct from the harm he suffered by HMH's infringement of his copyright: (1) he was deprived of the ability to set a fair price for licensing the number of reproductions of his photos that HMH intended to make when it sought his permission; and (2) he was delayed in his ability to discover that infringement and enforce his copyrights.

In a recent unpublished decision upon which HMH relies, the Southern District of New York held that a plaintiff making a fraud claim roughly identical to Wood's could not survive a motion to dismiss because "[a]bsent any infringement, McDougal would have reproduced only 40,000 copies of Plaintiff's copyrighted works, all in accordance with the contract terms." Semerdjian v. McDougal Littell, No. 07 Civ. 7496, 2008 WL 110942, at *3 (S.D.N.Y. Jan. 2, 2008). Yet that decision begs the central question at issue in a fraud case: whether the defendant made a false representation of material fact knowing it to be false, and intending that it be relied upon. See Coors, 112 P.3d at 66. If a copyright defendant did so, it most certainly could have caused harm separate from the harm of infringement itself, because it could have deprived the copyright holder of substantial licensing fees paid up front, rather than significantly delayed and only received–if ever–through litigation.

In other words, if the harm from infringement is the amount the copyright holder would collect for the number of copies the publisher reproduced in excess of the scope of the license, the harm from fraud would be the lost opportunity to the copyright holder from having its rightful licensing fee up front and in the absence of litigation, as well as the significant risk that the infringement might never have been discovered. While Wood has not come forward with evidence beyond his own depositions and affidavit, HMH has not established that there is not a triable issue of fact on this point. A reasonable jury

could find, by a preponderance, that HMH's alleged fraud caused Wood harm aside from that of copyright infringement.[10]

Furthermore, as long as the jury is instructed that it may not award Wood duplicative damages for the same injury, there is no requirement that Wood make an election of remedies between his fraud claim and his claim under the Copyright Act.[11] See Specialty Beverages, L.L.C. v. Pabst Brewing Co., 537 F.3d 1165, 1180 & n.12 (10th Cir. 2008); Youren v. Tintic School Dist., 343 F.3d 1296, 1306 (10th Cir. 2003); see also Singer v. Strauss, 851 P.2d 256, 258 (Colo. Ct. App. 1993). Contra Bucklew v. Hawkins, Ash, Baptie & Co., LLP, 329 F.3d 923, 933-34 (7th Cir. 2003) (affirming dismissal of a copyright plaintiff's fraud and punitive damages claim where that plaintiff sought identical compensatory damages for fraud and for copyright infringement, "so that [the] request for punitive damages is in fact a[n impermissible] request for punitive damages for copyright infringement"). Wood may not recover twice for the same injury, and he may not recover punitive damages for copyright infringement. He may, however, recover

---

[10]The Court does not mean to imply that Wood could not prove fraud damages that are subsumed within copyright damages, so long as the jury does not award him duplicative damages. It is not obvious to the Court why Wood could not assert alternative causes of action covering some of the same damages, and choose to allocate those damages to one of the causes of action rather than the other. However, the Court does not need to issue a definitive ruling on this matter now, because, as pointed out in the text, Wood does assert some discrete damages that are attributable to fraud and that lie outside of his claim for copyright infringement.

[11]Even if Wood's claims for fraud and copyright infringement were premised upon identical or overlapping damages, that would not be fatal to either claim at the summary judgment stage, as Wood is entitled to proceed to the jury on multiple theories of recovery derived from multiple causes of action.

separate damages for copyright infringement and fraud, and be eligible for exemplary damages on the fraud claim.

      e.      <u>Wood's fraud claim as preempted by the Copyright Act</u>

Finally, HMH argues that there is no material issue of fact "that can distinguish the gravamen of [Wood's] fraud claim from his infringement claim. Therefore, the fraud claim must be dismissed as preempted." (Dkt. #110 at 17.)

The Tenth Circuit has explained that although the Copyright Act preempts state copyright law,

> it does not eliminate all state law actions. For example, conduct that may give rise to a federal suit for copyright infringement may also give rise to a state law claim in tort for unfair competition, tortious interference, or breach of contract. However, 17 U.S.C. § 301(a) preempts such claims if "1) the work is within the scope of the 'subject matter of copyright' as specified in 17 U.S.C. [§§] 102 and 103; and 2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. [§] 106." <u>Gates Rubber Co. v. Bando Chem. Indus.</u>, 9 F.3d 823, 847 (10th Cir. 1993). On the other hand, <u>if "a state cause of action requires an extra element</u>, beyond mere copying, preparation of derivative works, performance, distribution or display, then <u>the state cause of action is qualitatively different from, and not subsumed within, a copyright infringement claim</u>." <u>Id.</u>

<u>La Resolana Architects, PA v. Clay Realtors Angel Fire</u>, 416 F.3d 1195, 1199 n.2 (10th Cir. 2005) (emphasis added). In order to determine whether the state cause of action is qualitatively different from the copyright infringement claim, this Court must "compare the elements of the causes of action, not the facts pled to prove them." <u>Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.</u>, 82 F.3d 1533, 1543 (10th Cir. 1996). A copyright defendant arguing preemption thus "takes the wrong approach by focusing its preemption

analysis on the conduct alleged to support the two causes of action." Id. (quotation omitted). "To correctly analyze [a] copyright preemption argument using the 'extra element' test," this Court simply "compare[s] the elements of a claim for copyright infringement to the elements" of the claim for which preemption is argued. Id. Here, that latter claim is fraud.

To prove copyright infringement under the Copyright Act of 1976, Wood must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, 499 U.S. at 361. To prove fraud under the Colorado common law, Wood must show

(1) that HMH made a false representation of a material fact,
(2) knowing that representation to be false;
(3) that Wood was ignorant of the falsity;
(4) that the representation was made with the intention that it be acted upon;
(5) and that reliance on the representation resulted in damage to Wood.

Coors, 112 P.3d at 66. Because the elements of fraud are different from the elements of copyright infringement, Wood's fraud claim is not preempted by the Copyright Act of 1976. See also 1-1 Nimmer on Copyright § 1.01[B][1] (2008) ("[I]f qualitatively other elements are required, instead of, or in addition to, the acts of reproduction, performance, distribution, or display, in order to constitute a state-created cause of action, then the right does not lie 'within the general scope of copyright,' and there is no pre-emption. Thus, the 'extra element' test generally furnishes the touchstone here." (footnotes omitted)).

f.    <u>Ruling on this issue</u>

Based on the foregoing, HMH's motion for summary judgment on Wood's fraud claim is DENIED.

2.    *HMH's arguments regarding Wood's fraudulent concealment claim*

a.    <u>Elements of fraudulent concealment under Colorado law</u>

To establish fraudulent concealment under Colorado law, Wood must show the following:

> (1) concealment of a material fact that in equity and good conscience should be disclosed;
>
> (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed;
>
> (3) ignorance of that fact on the part of the one from whom the fact is concealed;
>
> (4) the intention that the concealment be acted upon; and
>
> (5) action on the concealment resulting in damages.

<u>First Horizon Merchant Servs., Inc. v. Wellspring Capital Mgmt.</u>, 166 P.3d 166, 176 (Colo. Ct. App. 2007) (citing <u>Kopeikin v. Merchs. Mortgage & Trust Corp.</u>, 679 P.2d 599, 601 (Colo. 1984)).  Adopting the reasoning of the Restatement (Second) of Torts, the Colorado Court of Appeals has explained that "one party to a business transaction has a duty to disclose to the other 'facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade, or other objective circumstances, would reasonably expect a disclosure of those facts.'" <u>Berger v. Sec. Pac. Info. Sys., Inc.</u>,

795 P.2d 1380, 1383 (Colo. Ct. App. 1990) (quoting Restatement (Second) of Torts § 551(2)(e) (1965)).  "More specifically, a party has a duty to disclose if he has stated facts that he knows will create a false impression unless other facts are disclosed."  Id.

### b. HMH's concealment of material facts

HMH argues that because Wood "never asked HMH how many copies it intended to print or how many copies it had printed," and because "it is undisputed that HMH never made any representation about how many total copies it intended to print or had printed," HMH did not conceal the material fact of how many copies of Wood's photographs it intended to reproduce under the licenses.  (Dkt. #110 at 14.)  At least as to LOL 7, 2001 and 2002, SSRM 5, 2001, and SSRM 7, 2002, for which both HMH's request letters and Wood's invoices specify a print run of no more than 40,000, these arguments are plainly unavailing.  Given those written specifications, there would have been no reason for Wood to ask HMH "how many copies it intended to print or how many copies it had printed," because he had HMH's representation or his own license reservation that it would not exceed 40,000.  Wood has come forward with evidence, gained through discovery, that others licensing their copyrighted works to HMH also believed, reasonably, that the term "40,000" did, indeed, mean 40,000.  (Dkt. #133, Exs. 4, 5.)  Therefore, there is a genuine dispute of material fact as to whether HMH concealed material facts in its dealings with Wood.

### c. HMH's duty to disclose

HMH argues that Wood has not demonstrated that it had a duty to disclose the material facts of how many copies of his photographs it intended to reproduce under the licenses, or of how many copies it actually did reproduce. (Dkt. #110 at 115.) Under Colorado law, "one party to a business transaction has a duty to disclose to the other facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade, or other objective circumstances, would reasonably expect a disclosure of those facts." Berger, 795 P.2d at 1383 (quotation omitted). Once again, Wood has come forward with evidence, gained through discovery, that others licensing their copyrighted works to HMH also believed, reasonably, that the term "40,000" did, indeed, mean 40,000. (Dkt. #133, Exs. 4, 5.) One license, for instance, read, "This one time right is for circulation under 40,000. If additional publication of the book is warranted, rights for use of the image must be renewed." (Id., Ex. 4 at 28.) There is a genuine issue of material fact as to whether HMH had a duty to disclose to Wood the material facts of how many copies of his photographs it intended to reproduce and ultimately did reproduce.

### d. Ruling on this issue

HMH's motion for summary judgment on Wood's fraudulent concealment claim is DENIED.

3.    *HMH's argument regarding Wood's request for exemplary damages*

a.    Exemplary damages under Colorado law

The Colorado Statutes provide that "[i]n all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages."  Colo. Rev. Stat. Ann. § 13-21-102(1)(a) (West 2008) (emphasis added).  "The general purposes of punitive damages under section 13-21-102 are punishment of the defendant and deterrence against the commission of similar offenses by the defendant or others in the future."  Coors, 112 P.3d at 65.  "Consistent with these purposes, [the statute] requires that punitive damages shall only be awarded in a civil action where the party asserting the claim proves beyond a reasonable doubt that the injury sustained was attended by circumstances of fraud, malice, or willful and wanton conduct."  Id. (emphasis added); see Colo. Rev. Stat. Ann. § 13-25-127(2).  "The elements of 'circumstances of fraud' are identical with the necessary elements of fraud" under Colorado law.  Amber Props., Ltd. v. Howard Elec. & Mechanical Co., 775 P.2d 43, 46 (Colo. Ct. App. 1988) (citing Palmer v. A.H. Robins Co., 684 P.2d 187 (Colo. 1984)).

b.    Circumstances of fraud, malice, or willful or wanton conduct

HMH correctly points out that in order to be awarded exemplary damages at trial, Wood must demonstrate beyond a reasonable doubt that HMH's alleged fraud was

attended by "circumstances of fraud, malice, or willful or wanton conduct." (Dkt. #110 at 18 (quoting Colo. Rev. Stat. Ann. § 13-21-102(1)(a)). However, HMH goes on to argue that in order to make that demonstration, Wood must show that there were "aggravating circumstances" to the fraud, and that HMH acted with "evil intent." (Id. at 19 (quoting Palmer, 684 P.2d at 213-14; Colo. Performance Corp. v. Mariposa Assocs., 754 P.2d 401, 409 (Colo. Ct. App. 1987).)

In Palmer, the Colorado Supreme Court explained that a claim for punitive damages under section § 13-21-102 "is not a separate and distinct cause of action," but rather "auxiliary to an underlying claim for actual damages." 684 P.2d at 213. As a result, the statute applies not of its own force or in "'the absence of a successful underlying claim for actual damages,'" but instead "'applies only when a civil wrong has been attended by aggravating circumstances.'" Id. (quoting Harding Glass Co. v. Jones, 640 P.2d 1123, 1127 (Colo. 1982)). In other words, the passage from which HMH quotes simply explains that section 13-21-102 does not create a freestanding cause of action; that passage does not change what Wood must prove, beyond a reasonable doubt, in order to be eligible for exemplary damages.

Similarly, in Colorado Performance Corporation, the Colorado Court of Appeals did not hold that a fraud plaintiff must demonstrate that a defendant acted with "evil intent"; rather, the court held that the lower court did not abuse its discretion in refusing to award exemplary damages even though it found that the defendant had "engaged in fraudulent conduct." 754 P.2d at 409. The court explained that even where the factfinder

has made a determination that a defendant "has engaged in fraudulent conduct," Colorado's exemplary damages statute "<u>authorizes</u>, <u>but does not require</u>, an award of exemplary damages.  An award of such damages 'rests in the discretion of the trier of fact.'" <u>Id.</u> (quoting <u>Mince v. Butters</u>, 616 P.2d 127 (Colo. 1980); emphasis added).  Once again, the authority HMH cites does not alter Wood's burden in demonstrating that he is <u>eligible</u> for exemplary damages.  Wood must show, beyond a reasonable doubt, that HMH's alleged fraud was attended by "circumstances of fraud, malice, or willful or wanton conduct," Colo. Rev. Stat. Ann. § 13-21-102(1)(a); and in Colorado, "[t]he elements of 'circumstances of fraud' are identical with the necessary elements of fraud," <u>Amber Props.</u>, 775 P.2d at 46.

<b>c.  <u>Ruling on this issue</u></b>

For the same reasons that HMH's motion for partial summary judgment on Wood's fraud claim is denied, HMH's motion for partial summary judgment on his request for exemplary damages is also DENIED.  Because Wood has come forward with evidence to support his claims of fraud and fraudulent concealment, and HMH has not demonstrated that there is no genuine issue of material fact remaining as to those claims, a reasonable jury could find beyond a reasonable doubt that HMH's conduct was attended by "circumstances of fraud."  That jury would then have discretion to award or refuse to award exemplary damages.

4.    *Summary of rulings on this motion*

HMH's motion for partial summary judgment on Wood's fraud claims and request for exemplary damages is DENIED in its entirety.

## IV. Conclusion

For the foregoing reasons, the following is hereby ORDERED:

Wood's motion for partial summary judgment against HMH is GRANTED for the following publications:  (1) LOL 7, 2001; (2) LOL 7, 2002; (3) SSRM 5, 2001; (4) SSRM 7, 2002; (5) SSRM 5, 2008; (6) SSRM 7, 2008.  Wood's motion for partial summary judgment against HMH is DENIED for the following publications: (1) LOL 6, 2001; (2) LOL 6, 2002.

Wood's motion for partial summary judgment against Donnelley is GRANTED for (1) LOL 7, 2001, and (2) LOL 7, 2002.  Wood's motion for partial summary judgment against Donnelley is DENIED for (1) LOL 6, 2001, and (2) LOL 6, 2002.

HMH's motion for summary judgment on Wood's request for the disgorgement of profits is DENIED.

Donnelley's motion for partial summary judgment on Wood's <u>Summer Success</u> claims is GRANTED.  Donnelley's motion for partial summary judgment on Wood's request for the disgorgement of profits is DENIED.

HMH's motion for partial summary judgment on Wood's fraud claims and request for exemplary damages is DENIED in its entirety.

DATED at Denver, Colorado, this 15th day of December, 2008.

BY THE COURT:

*s/ David M. Ebel*

_____

David M. Ebel
United States Circuit Judge